# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA for use and benefit of COUNTRY BOYS FEED AND FARM SUPPLY, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | ) Case No. 08-3429-CV-S-GAF |
| JOHN EICKELMANN d/b/a JOHN EICKELMANN ELECTRIC, et al., | )<br>)<br>) |
| Defendants. | ) |

## ORDER

Presently before the Court is Defendants American Eagle Design-Build Studio, LLC ("American Eagle"), Leonard Wood Family Communities, LLC ("LWFC"), and Lexon Insurance Company's ("Lexon") (collectively "AE Defendants") Motion for Summary Judgment filed pursuant to Fed. R. Civ. P. 56. (Doc. #27). AE Defendants assert Use Plaintiff Country Boys Feed and Farm Supply's ("Country Boys") claims are time-barred by both the notice requirement and the limitation period set forth in the Miller Act, 40 U.S.C. § 3131, *et seq.* (2006) (the "Miller Act"), and that Country Boys's state law claims of quantum meruit and vexatious refusal to pay fail as a matter of law. For the following reasons, AE Defendants' Motion is **GRANTED** in part and **DENIED** in part.

## DISCUSSION

### I. Facts

The instant action arises from Defendant John Eickelmann d/b/a John Eickelmann Electric's ("Eickelmann") failure to pay Country Boys for electrical supplies provided to Eickelmann in

1

conjunction with his work on a residential housing development located at Fort Leonard Wood, Pulaski County, Missouri (the "Project"). (Complaint). On May 1, 2005, American Eagle and LWFC entered into one (1) government construction contract (the "Prime Contract"), wherein American Eagle would design, perform, install, furnish, and supply all materials, equipment, labor, and incidentals necessary or incidental to the completion of the Project. (Design-Build Agreement, pp. 1-3). The Prime Contract provided for seven distinct phases of the Project. *Id.* at Ex. 1.

In accordance with the Prime Contract, American Eagle entered into a series of written agreements with Eickelmann, wherein Eickelmann promised to perform certain electrical subcontracting work for the Project. (Lee Aff., ¶¶ 3-11). The following chart lists the date of the written agreement between American Eagle and Eickelmann, the subcontract number, the name given to the corresponding work, and the date on which the work was allegedly completed.

| **Date entered** | **Subcontract Number** | **Name** | **Date completed[1]** |
| --- | --- | --- | --- |
| December 14, 2005 | AEDBSFLW-EIC-05-46 | SP 39 | June 19, 2006 |
| December 28, 2005 | AEDBSFLW-EIC-05-58 | SP 41 | June 26, 2006 |
| December 28, 2005 | AEDBSFLW-EIC-05-59 | SP 40 | July 3, 2006 |
| December 28, 2005 | AEDBSFLW-EIC-05-60 | SP 38 | June 15, 2006 |
| March 3, 2006 | AEDBSFLW-EIC-06-98 | SP 43 | August 3, 2006 |
| June 12, 2006 | AEDBSFLW-EIC-06-140 | Phase 1 and Turner | June 19, 2007 |
| March 21, 2007 | AEDBSFLW-JEE-07-184 | N Eagle Point | February 4, 2008 |
| June 18, 2007 | AEDBSFLW-EIC-07-306 | S Piney Estates | November 15, 2007 |
| June 18, 2007 | AEDBSFLW-EIC-07-324 | N Piney Estates | February 4, 2008 |

---

[1]Country Boys disputes the completion dates given by AE Defendants, alleging they have not provided full Rule 26 disclosures. (Plaintiff's Response to Defendants' Statement of Facts, ¶¶ 21-29).

*Id.* at ¶¶ 3-11, 22-30  American Eagle had no contractual relationship with Country Boys for any of the above projects. *Id.* at ¶ 12.

Nine (9) payment bonds were procured between April 3, 2006, and November 29, 2007. *Id.* at ¶¶ 13-21. Each payment bond names American Eagle as "Contractor" and LWFC as "Owner." (Bond ## SU1019848, 1021572-76, 1023440-42).  The following chart lists the issue date, the bond number, the bond amount, the description of the work secured as listed on the bond, and the surety.

| Issue Date | Bond Number | Bond Amount | Description | Surety |
| --- | --- | --- | --- | --- |
| April 3, 2006 | SU1019848 | $8,251,834 | S Pence Development Area | Arch Insurance Company |
| July 9, 2007 | 1021572 | $3,492,000 | Phase 1h (Project No. 540209115) | Lexon |
| July 9, 2007 | 1021573 | $3,686,000 | Phase 1c/1d (Project No. 540209115) | Lexon |
| July 9, 2007 | 1021574 | $2,134,000 | Phase 1e/1f (Project No. 540209115) | Lexon |
| July 9, 2007 | 1021575 | $4,850,000 | Phase 1g (Project No. 540209115) | Lexon |
| July 9, 2007 | 1021576 | $582,000 | Phase 2c (Project No. 540209115) | Lexon |
| November 29, 2007 | 1023440 | $582,000 | Phase 2c (Project No. 540209115) | Lexon |
| November 29, 2007 | 1023441 | $3,492,000 | Phase 1h (Project No. 540209115) | Lexon |

| | | | | |
|---|---|---|---|---|
| November 29, 2007 | 1023442 | $3,686,000 | Phase 1c/1d (Project No. 540209115) | Lexon |

*Id.*

Country Boys and Eickelmann purportedly entered into an oral agreement, wherein Eickelmann would have an open account with Country Boys, it would supply electrical materials to him for the Project, and Eickelmann would pay Country Boys upon receipt of payment from American Eagle. (Norris Aff., ¶ 2). Country Boys began supplying electrical materials to Eickelmann for the Project in December 2005. *Id.* According to Frank Norris, the owner and authorized agent of Country Boys, Country Boys last supplied electrical materials to Eickelmann for the Project on January 29, 2008. *Id.*

In December 2007, Mr. Norris contacted American Eagle regarding lien waivers and Country Boys's payment issues with Eickelmann. (Norris, ¶ 3). In a February 11, 2008, letter sent by Country Boys's counsel to American Eagle, Country Boys requested copies of all contracts entered into between American Eagle and Eickelmann, lien waivers, and bonding information with regard to a Miller Act claim. (2/11/08 Ltr.). Country Boys did not provide any amounts due in this correspondence. *Id.* However, at some point during February 2008, Fredrica Norris, on behalf of Country Boys, hand-delivered to American Eagle computer-generated invoices, presumably for the amounts owed by Eickelmann. (Fredrica Norris Aff.). Mr. Norris claims American Eagle contacted him after receipt of the invoices and stated that it believed Country Boys had been paid for all of the invoices as evidenced by signed lien waivers.[2] (Norris Aff., ¶ 6). Mr. Norris states lien waivers

---

[2]Between February 26, 2007, and November 25, 2007, Country Boys executed seventeen (17) separate Waivers of Right to File Lien totaling $316,336.91 for materials supplied to Eickelmann between December 26, 2006, and October 2007. (Doc. #28-50 to -67).

4

were not required prior to January 2007 and Country Boys has not been fully compensated. *Id.*

On March 10, 2008, Peter White, Design Build Manager for American Eagle, responded to Country Boys's February 11 letter, indicating American Eagle was "in the process of notifying [Eickelmann] of [his] default at the Project," but did not provide the requested information to Country Boys. (3/10/08 Ltr.). On March 19, 2008, in reply to the March 10 correspondence, Country Boys sent a letter to American Eagle, demanding it provide the information requested on February 11. (3/19/08 Ltr.). Attached to the March 19 letter was an Affidavit of Mr. Norris. (3/19/08 Norris Aff.). Norris stated in his Affidavit that Country Boys supplied materials to Eickelmann "for work he completed pursuant to the contracts that he had and/or has with American Eagle known as Leonard Wood Family Communities, LLC Privatization Project," that Country Boys had not received payment from Eickelmann for those materials, and that Country Boys was making a claim against the bonding company. *Id.* at ¶¶ 2-4. Both the March 19 letter and Mr. Norris's Affidavit fail to specify any amount Country Boys was claiming. (3/19/08 Ltr.; 3/19/08 Norris Aff.). On May 14, 2008, James Redwine, counsel for American Eagle responded to Country Boys's Miller Act claim by stating that American Eagle's investigation revealed the notice period had run for the amounts still owing and, therefore, American Eagle would not compensate Country Boys for Eickelmann's failure to pay. (5/14/08 Ltr.).

On July 16, 2008, Country Boys sent a letter to American Eagle stating Country Boys had a claim pursuant to the Miller Act for supplies provided to Eickelmann for the Project. (7/16/08 Ltr.). Country Boys stated it was seeking $452,442.83 for the materials it provided for the Project from American Eagle or its bonding company. *Id.* In this letter, Country Boys stated that it "last furnished materials to Mr. Eickelmann in December of 2007." *Id.*

5

**II.      Standard**

Pursuant to Fed. R. Civ. P. 56(c)(2), summary judgment is appropriate if no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. "The movant bears the burden of making this showing, and the party opposing the motion must set forth specific facts showing that there is a genuine issue for trial." *Whisenhunt v. Sw. Bell Tel.*, 573 F.3d 565 (8th Cir. 2009) (internal quotation marks and citations omitted). When ruling on a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).

An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes that are irrelevant or unnecessary will not be considered. *Id.* In the absence of a factual dispute relating to an essential element of a party's claims, the Court will proceed to determine whether that party is entitled to judgment as a matter of law. *See E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001).

**III.     Analysis**

*A.      The Miller Act Claims*

Because subcontractors and suppliers are prohibited from imposing liens on governmental facilities, the Miller Act requires a prime contractor on a federal construction project to post a payment bond to protect "all persons supplying labor and material in carrying out the work provided for in the contract." 40 U.S.C. § 3131(b)(2); *United States ex rel. Lighting & Power Servs., Inc. v. Interface Constr. Corp.*, 553 F.3d 1150, 1153 n.2 (8th Cir. 2009). Thus, where a subcontractor defaults, "suppliers of materials to subcontractors on federal construction projects may recover from

6

the general contractor's payment bond any unpaid amount due from the subcontractor." *United States ex rel. J. D. Fields & Co. v. Gottfried Corp.*, 272 F.3d 692, 696 (5th Cir. 2001).

"The Miller Act is highly remedial and entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects." *F. D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 124 (1974) (citation omitted). That being said, suppliers must satisfy the statutory timing requirements to proceed on any claim against a payment bond. *See Fleisher Eng'g & Constr. Co. v. United States ex rel. Hallenbeck*, 331 U.S. 15, 17-18 (1940) (holding that "compliance with the prescribed [time] limitation [set forth in the Miller Act] was essential to the assertion of the right conferred").

The Miller Act provides for two separate timing requirements: (1) the 90-day notice provision; and (2) the one-year statute of limitation. § 3133(b)(2), (4). Under the 90-day notice provision,

> [a] person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing the payment bond may bring a civil action on the payment bond on giving written notice to the contractor within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made.

§ 3133(b)(2). The Miller Act further prescribes that a supplier must bring its cause of action "no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action." § 3133(b)(4).

As an initial matter, the Court notes the language of notice provision and the language of the statute of limitation differ in one important respect: the notice provision is modified by the phrase "for which the claim is made," whereas the statute of limitation is not so modified. *Compare* § 3133(b)(2) *with* § 3133(b)(4). "[W]here Congress includes particular language in one section of a

7

statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Bates v. United States*, 522 U.S. 23, 29-30 (1997) (citation omitted).

As noted above, the overall purpose of the Miller Act is to ensure suppliers are paid for materials and labor used on a federal construction project. *United States ex rel. United Bhd. of Carpenters & Joiners Local Union No. 2028 v. Woerfel Corp.*, 545 F.2d 1148, 1150 (8th Cir. 1976). But the Miller Act also protects the prime contractor through the 90-day notice provision. *See J. D. Fields*, 272 F.3d at 696 & *United States ex rel. Robert DeFilippis Crane Serv., Inc. v. William L. Crow Constr. Co.*, 826 F. Supp. 647, 652 (E.D.N.Y. 1993). "The purpose of the notice requirement is to establish a time after which the principal contractor can pay its subcontractor, certain that it will not be exposed subsequently to the claims of those who have supplied labor and materials to the subcontractor." *United States ex rel. John D. Ahern Co. v. J. F. White Contracting Co.*, 649 F.2d 29, 31 (1st Cir. 1981) (citing *Bowden v. United States ex rel. Malloy*, 239 F.2d 572, 577-78 (9th Cir. 1956)). *See also United States ex rel. Blue Circle W., Inc. v. Tucson Mech. Contracting, Inc.*, 921 F.2d 911, 914 (9th Cir. 1990). "Without such notice, the prime contractor would have no ready means to determine the extent of its ultimate obligations." *Robert DeFilippis*, 826 F. Supp. at 652. Given the different language found in the two timing requirements and the purposes behind the Miller Act generally and the notice provision particularly, the Court believes Congress intended that the running of the two separate timing requirements could be triggered by different events and at different points in time.

Circuits examining factual situations similar to this case have unanimously held that the one-year statute of limitation begins to run from the date of supplying the last material for use in the

overall project described in the prime contract. *See Gen. Elec. Co. v. S. Constr. Co.*, 383 F.2d 135, 138 (5th Cir. 1967); *United States ex rel. Aetna Drywall Contractors, Inc. v. Aetna Cas. & Sur. Co.*, 725 F.2d 650, 650-51 (11th Cir. 1984); *United States ex rel. GE Supply, a Div. Of Gen. Elec. Co. v. C & G Enter., Inc.*, 212 F.3d 14, 18 (1st Cir. 2000). Under this interpretation, the one-year statute of limitation only runs once for each supplier on a project. *GE Supply*, 212 F.3d at 18. This avoids piecemeal litigation, providing one litigation to recover for materials supplied over the course of a project, while still protecting suppliers from delinquent subcontractors. *Id.* The Court, therefore, adopts this interpretation.

In contrast, the Court construes the 90-day notice requirement as running from the date of supplying the material at issue pursuant to some underlying contract between the subcontractor and the supplier. *See Robert DeFilippis*, 826 F. Supp. at 655. "Where claims are based on a series of contracts, a claim must be made within 90 days from the date on which the supplier 'furnished or supplied the last of the material' for each underlying contract." *Id.* Generally, an open account should not be considered a contract for purposes of the notice provision. *Id.* at 654-55. Rather, the separate orders of materials under the open account, which are typically represented in purchase orders or invoices, satisfy the underlying contract requirement. *Id.* As explained herein, this interpretation comports with the literal language of the § 3133(b)(2) and satisfies the purposes of the Miller Act.[3]

The 90-day notice provision provides that a supplier with a "direct contractual relationship"

---

[3] The Court acknowledges federal courts are split on this issue. However, after thorough review and research of cases discussing the notice provision, this Court is persuaded by, and therefore adopts, the reasoning set forth by the *Robert DeFilippis* court, which examined a series of cases from various district and appellate courts. *Id.* at 654-56.

9

with a subcontractor must serve notice of the subcontractor's default on the prime contractor within 90 days from the date on which the supplier "supplied the last of the material *for which such claim is made*." § 3133(b)(2) (emphasis added); *Robert DeFilippis*, 826 F. Supp. at 654. Thus, a claim must be based on an "underlying contract, whether established in a telephone call or in a formal document." *Robert DeFilippis*, 826 F. Supp. at 654.

For example, if a plumbing supply company enters into twenty contracts with a subcontractor to provide plumbing materials for a federal construction project over a five year period and receives no payment on the first contract, the supplier would then have a claim. *Id.* If this same supplier last furnished plumbing materials pursuant to the first contract on February 1, 2005, then the supplier has 90 days from that date to notify the prime contractor of its claim. *Id.* The supplier is barred from presenting its notice based on this contract some four or five years later, even if the supplier continued to provide plumbing materials to the same subcontractor under subsequent contracts for the same federal construction project. *Id.*

The interpretation the Court adopts today protects prime contractors from the possibility of double payments and interminable delays in payments to subcontractors. *United States ex rel. I. Burack, Inc. v. Sovereign Constr. Co.*, 338 F. Supp. 657, 661 (S.D.N.Y. 1972) (citing *United States ex rel. J.A. Edwards & Co. v. Thompson Constr. Corp.*, 273 F.2d 873, 875-76 (2d Cir. 1959)). The notice provision "is for the benefit of the prime contractor and not for the benefit of the supplier." *United States ex rel. Gen. Elec. Co. v. H.I. Lewis Constr. Co.*, 375 F.2d 194, 201 (2d Cir. 1967). "Only if the prime contractor receives notice of the failure of its subcontractor to pay can it protect itself from claims by suppliers by withholding appropriate amounts." *Robert DeFilippis*, 826 F. Supp. at 655. Requiring suppliers to notify the prime contractor of a subcontractor's default once

it is apparent the subcontractor cannot or will not pay invoices for materials previously supplied is nothing more than a reasonable business practice. As one court explained:

> To expect a Miller Act supplier to send out statements on open accounts on a consistent basis, be it weekly, monthly, or quarterly, is to do no more than hold the supplier to comport with generally accepted business practices of today. . . . The general contractor should expect that any supplier who provides labor or material to a subcontractor covered under the Miller Act on an open account or credit basis bills the subcontractor on a regular basis. Once the supplier sees that the subcontractor cannot or will not keep his account current, a demand letter or notice to the general contractor should be issued. . . . The Miller Act was not intended to serve as a license for suppliers to act in a manner contrary to contemporary business practices and to their own detriment. . . . It would be inequitable to construe Section [3133(b)(2)] to condone injudicious and indolent business practices on the part of suppliers who undertake to deal with Miller Act subcontractors on an open account basis.

*United States ex rel. A & M Petroleum, Inc. v. Sante Fe Eng'g, Inc.*, 660 F. Supp. 1111, 1114 (S.D. Miss. 1987) *rev'd* 822 F.2d 547 (5th Cir. 1987).[4]

But the benefits of such interpretation are not limited to the prime contractor. *Robert DeFillipis*, 826 F. Supp. at 654. The supplier is also ultimately benefitted. *Id.* With notice of a subcontractor's default, the prime contractor can make checks co-payable to subcontractors and suppliers or take other steps to remedy non-payment issues while the prime contractor still retains leverage over the subcontractor. *Id.*

Therefore, the Court finds that, where material is provided pursuant to a series of contracts, the claim evolves from each contract. *I. Burack*, 338 F. Supp. at 661. Any other interpretation

---

[4]The Fifth Circuit reversed this decision in a summary opinion that did not examine the statutory language, the statutory purpose, or the legislative history. 822 F.2d 547 (5th Cir. 1987). The court held that the notice period was not triggered until the last of the material was supplied to the overall project, notwithstanding whether the materials were delivered under a single contract or a series of contracts. *Id. See also Robert DeFilippis*, 826 F. Supp. at 655.

would be inconsistent with the purpose of the notice provision of the Miller Act.[5]

Given the Court's interpretation of the timing requirements, it is clear that Country Boys's Complaint was filed within the one-year limitation period. Country Boys last supplied electrical materials to the Project on January 29, 2008, and filed its Complaint on November 24, 2008. As such, this action was timely filed.

However, questions of material fact preclude determination on the notice provision issue. At this time, it is unclear, based on the record before the Court, whether underlying contracts existed and when each underlying contract was completed. The record only supports, when viewed in favor of Country Boys, a finding that Country Boys agreed to supply electrical materials to Eickelmann for the Project on an open account and that invoices, which were supplied to American Eagle in February 2008, went unpaid. Neither the invoices themselves or any details about the content of those invoices have been provided. While the Court is inclined to believe that these invoices represent underlying contracts, such belief is based solely on speculation and conjecture. Without more, AE Defendants have not satisfied their burden to show no genuine issues of material fact remain. Thus, summary judgment must be **DENIED** as to the Miller Act claims at this point in the proceedings.[6]

### B.     *Quantum Meruit and Vexatious Refusal to Pay Claims*

---

[5]AE Defendants argue either the Project's phases, the nine (9) subcontracts, or the various payment bonds issued should necessarily establish when the 90-day notice period begins to run. For the reasons set forth above, the Court declines to address AE Defendants' arguments and believes its interpretation of the notice provision better reflects Congress's intent and the purposes of the statute.

[6]Because AE Defendants did not satisfy their burden to demonstrate when the notice period began to run, the Court need not address when proper notice was given.

AE Defendants also moved for summary judgment on the quantum meruit and vexatious refusal to pay claims. (Doc. #27, ¶¶ 5-7). Country Boys did not address those arguments in its Response Brief and, therefore, is deemed to have abandoned those claims. *See United States v. NHC Health Care Corp.*, 163 F. Supp. 2d 1051, 1058-59 (W.D. Mo. 2001). Accordingly, summary judgment is **GRANTED** with regards to the quantum meruit and vexatious refusal to pay claims.[7]

## CONCLUSION

Country Boys has met the one-year statute of limitation requirement in the Miller Act; however, genuine issues remain as to whether notice was timely. Further, Country Boys abandoned its quantum meruit and vexatious refusal to pay claims. Therefore, AE Defendants' Motion is **DENIED** as to the Miller Act claims and **GRANTED** as to the quantum meruit and vexatious refusal to pay claims.

**IT IS SO ORDERED.**

s/ Gary A. Fenner<br>
Gary A. Fenner, Judge<br>
United States District Court

DATED: **March 2, 2010**

---

[7]For this reason, Country Boys's Motion to Withdraw Without Prejudice (Doc. #32) is **DENIED** as moot.